IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| LUKE CONWELL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 3:18-CV-131-MAB |
| | ) |
| MARCUS MARVIN and | ) |
| HOPE COOPER, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM AND ORDER

**BEATTY, Magistrate Judge:**

This matter is before the Court on the motion for summary judgment filed by Defendant Hope Cooper (Doc. 61). For the reasons explained below, the motion is granted in part and denied in part.

### BACKGROUND

On January 24, 2018, Plaintiff Luke Conwell filed this civil rights lawsuit pursuant to 42 U.S.C. § 1983 alleging deprivations of his Eighth Amendment rights while incarcerated at Shawnee Correctional Center. (Doc. 1). After a threshold review of the complaint pursuant to 28 U.S.C. § 1915A and a round of summary judgment on the issue of exhaustion, the following claims currently remain:

> **Count 1 –** Sergeant Marcus Marvin used excessive force against Plaintiff on March 20, 2017 when he slammed his hand into the chuckhole and stabbed it repeatedly with the chuckhole key, and Nurse Hope Cooper either failed to intervene or approved, condoned, or turned a blind eye to the conduct, in violation of the Eighth Amendment;

>**Count 2 –** Sergeant Marvin committed an assault and/or battery against Plaintiff in violation of Illinois state law when he slammed his hand in the chuckhole and stabbed it repeatedly with the chuckhole key; and
>
>**Count 3 –** Nurse Cooper was deliberately indifferent to Plaintiff's injuries after the March 20, 2017 incident when Cooper refused to get him medical attention for 3 days following the events at issue, in violation of the Eighth Amendment.

(Doc. 7; Doc. 8; Doc. 43; Doc. 46).

Defendant Hope Cooper filed a motion for summary judgment as to Counts 1 and 3 on October 20, 2020 (Doc. 61; *see also* Doc. 62). Plaintiff filed a "Declaration in Opposition" on November 5, 2020 (Doc. 64). Nurse Cooper did not file a reply brief.

## FACTUAL BACKGROUND

Plaintiff Luke Conwell was an inmate in the Illinois Department of Corrections, housed at Shawnee Correctional Center during the events that gave rise to this lawsuit. He has since been released from prison and now resides in Texas (Doc. 65).

Hope Cooper is a licensed practical nurse in the State of Illinois (Doc. 62-1, p. 1). She was employed by Wexford Health Sources, Inc., as a nurse at Shawnee Correctional Center from approximately November 2016 through August 2018 (*Id.*).

On March 20, 2017, Plaintiff was housed in the Room Restriction area at Shawnee (Doc. 62-1, p. 1; Doc. 62-2, p. 27). Inmates housed in this area were restricted to their rooms as discipline for minor infractions of facility rules (Doc. 62-1, p. 1; Doc. 62-2, p. 27). As Plaintiff explained, "you have to stay in your room all day . . . but you get to keep all your possessions" (Doc. 62-2, p. 27). Inmates in Room Restriction had to have their medications brought to them by a nurse (Doc. 62-1, p. 1). This task was called "med pass" (*Id.*).

Plaintiff testified, and Nurse Cooper did not dispute, that during med pass, the nurse is accompanied by a correctional officer, who is responsible for opening and closing the chuckhole on the cell door (Doc. 62-2, pp. 34–36). The officer opens the chuckhole, the inmate "provide[s] their name and ID" and sticks their hand out the chuckhole, the nurse puts the medication(s) in the inmate's hand, the inmate takes the medication and then opens their mouth to show that the inmate swallowed the medication (*Id.*). The process is then repeated for the other inmate in the cell if they also receive medications (*Id.*). After both inmates have received and taken their medications, the officer closes and locks the chuckhole door, and the officer and nurse move on to the next cell (*Id.* at p. 37). Plaintiff testified that it takes only "mere seconds" for the nurse to dispense an inmate's medications to him, and then the nurse moves on to the next cell (*Id.* at pp. 39, 93).

It is undisputed that Nurse Cooper did med pass in Room Restriction on the evening of March 20, 2017 (Doc. 62-1, p. 1; Doc. 62-2, p. 31). It is also undisputed that Correctional Sergeant Marcus Marvin accompanied her (Doc. 62-1, p. 2; Doc. 62-2, p. 31). Plaintiff admits that he did not speak with Nurse Cooper or interact with her in any way, aside from her handing him medication through the chuckhole in the door to his cell (Doc. 62-2, pp. 69–70).

As Plaintiff tells it, after Nurse Cooper gave him the pills, she just stood there next to Sgt. Marvin (Doc. 62-2, pp. 40, 73). Either at the same time Nurse Cooper was dispensing his meds or immediately thereafter, Plaintiff asked Sgt. Marvin for a roll of toilet paper because he had not received one as scheduled (*compare* Doc. 62-2, pp. 34, 38–39, 71 (Plaintiff's testimony that he received his medications and then asked Sgt. Marvin

for toilet paper) *with id.* at pp. 73, 74 (Plaintiff's testimony that he was interacting with Sgt. Marvin the entire time and asked him for toilet paper at the same time Nurse Cooper was giving him his medications)). Sgt. Marvin refused Plaintiff's request and Plaintiff then showed Marvin that he was out of toilet paper by sticking the empty cardboard roll out of the chuckhole (*Id.* at pp. 39, 40). Sgt. Marvin again refused, and Plaintiff then asked for a grievance form; Plaintiff's hand was still sticking out of the chuckhole holding the empty cardboard roll (*Id.* at pp. 40, 44, 45–46). Sgt. Marvin did not say anything and instead "instantly" "slammed" the chuckhole door down onto Plaintiff's hand (*Id.* at pp. 41, 42). Sgt. Marvin held the chuckhole door down and started jabbing at the top of Plaintiff's hand with the chuckhole key (*Id.* at pp. 42, 43). Sgt. Marvin was pushing down on the chuckhole door so hard that Plaintiff could not pull his hand back in (*Id.* at p. 43). Plaintiff estimated that Sgt. Marvin stabbed him with the key about three times and said it "opened up a big gash on the top of [his] hand" (*Id.* at pp. 43, 44; *see also id.* at pp. 51, 52). Sgt. Marvin eventually eased up on the chuckhole door and Plaintiff was able to pull his hand back into his cell (*Id.* at p. 50). When asked how long his hand was caught in the chuckhole, Plaintiff responded, "[s]econds, maybe five or ten seconds" (*Id.*). Neither Plaintiff nor Sgt. Marvin said anything the entire time Plaintiff's hand was caught in the chuckhole (*Id.* at pp. 49–50). Sgt. Marvin then closed the chuckhole door and said "now write that up." (*Id.* at pp. 50–51). Then Sgt. Marvin and Nurse Cooper walked off and went to the next cell to continue handing out medications (*Id.* at pp. 40, 51).

Nurse Cooper, on the other hand, says that she gave Plaintiff his medication and then moved to another cell to give another inmate his medication (Doc. 62-1, p. 2). She

did not see or hear Sgt. Marvin strike Plaintiff (*Id.*). If she had, she would have written an incident report, as that was her practice when she witnessed a physical altercation at Shawnee (*Id.*).

Plaintiff testified that 30 to 40 seconds after Nurse Cooper and Sgt. Marvin walked off, his hand started bleeding (Doc. 62-2, p. 51). He estimated the gash was an inch long and one or two centimeters wide (*Id.* at p. 52). He ran water over it and then tore off a piece of his sheet and wrapped it around his hand (*Id.* at pp. 51, 53–54).

Plaintiff alleged in his complaint that he spoke with Nurse Cooper for the next three days following the incident but she denied his requests for medical care (Doc. 1, pp. 4, 5). At his deposition, Plaintiff likewise stated that the first time he spoke with Nurse Cooper was on March 21st (Doc. 62-2, pp. 90–91). He told Nurse Cooper that he was going to file a grievance and asked if she would be willing to give a statement to Internal Affairs and she said yes and gave him her name (*Id.* at p. 92). Plaintiff testified he talked to Nurse Cooper again each time she did med pass (*Id.* at pp. 96, 97). He said he asked for a band-aid and she said she did not have any (*Id.*). He also asked her to go to the health care unit and she told him to fill out a sick call request (*Id.*).

For her part, Nurse Cooper stated in a declaration that she did not do med pass during the three days following the incident—March 21, 22, and 23, (Doc. 62-1, p. 3), which is what Plaintiff's Medication Administration Records also reflect (Doc. 62-3, p. 4). Rather, she did not do med pass again until the evening of March 26 and the evening of March 27 (Doc. 62-1, p. 3; Doc. 62-3, p. 4). Nurse Cooper said in her declaration that she recalls Plaintiff speaking to her during the week of March 20, 2017, and asking for her

name because, he said, she had witnessed Sgt. Marvin strike his hand (Doc. 62-1, p. 2). Nurse Cooper said she told Plaintiff that she "did not witness any such event" (*Id.*). Nurse Cooper also stated in her declaration that she did not see Plaintiff with an open or otherwise untreated wound on his hand during the week including March 20, 2017 (*Id.*). If she had, she would have arranged for him to be sent to the Health Care Unit as soon as permitted by security in order to receive treatment for the wound (*Id.* at p. 3).

With respect to the medical care that Plaintiff received, Nurse Cooper submitted a very limited portion of Plaintiff's medical records; five pages to be exact (Doc. 62-3). She discussed only a sick call appointment on March 21st regarding back pain and an encounter with a social worker on March 23rd (Doc. 62). However, it is clear from Plaintiff's testimony and other documents previously submitted in this case that there is much more to the story than what Nurse Cooper portrayed.[1] The following recounts the information from the various sources in chronological order.

Nurse Cooper submitted a record showing that Plaintiff attended an appointment with Nurse Practitioner Tammy Pittayathikhun on March 21st at 10:10am, which is the morning after the alleged incident with Sgt. Marvin (Doc. 62-3, p. 1). The note from this visit indicates that Plaintiff complained of back pain and that his medication was

---

[1] The other documents are the grievance records previously submitted in connection with the IDOC Defendants' motion for summary judgment on the issue of exhaustion (Doc. 30-1). These records contain, in pertinent part, an email chain that was part of the ARB's investigation into Plaintiff's emergency grievance dated March 20, 2017 (Doc. 30-1, pp. 9–20). There is an email from the Health Care Unit Administrator at Shawnee that described medical care Plaintiff received for his hand and an email from Internal Affairs Officer Jerid Pickford that discussed the investigation into Plaintiff's hand injury (*Id.* at pp. 15–17)

ineffective (*Id.*). The note does not mention anything about a wound on Plaintiff's hand (*see id*). Plaintiff did not independently recall this appointment and he could not explain why he would not have reported his injury at that time (Doc. 62-2, pp. 83–85). According to Nurse Cooper, if an inmate with an open or otherwise untreated wound on his hand attended an appointment—for any reason—at the Health Care Unit at Shawnee, it was the practice of the medical staff to both make a note of the wound in the medical records, and to administer treatment to the wound immediately (Doc. 62-1, p. 4).

Plaintiff testified that he asked a nurse named Cassie for medical care for his hand when she did med pass, and he showed her his hand by sticking it through the chuckhole (Doc. 62-2, pp. 78–79). Plaintiff said Nurse Cassie told him that she would call him over to the Health Care Unit and she did about an hour later, according to Plaintiff's estimation (*Id.* at pp. 79, 80). She cleaned the cut and bandaged it (*Id.* at p. 80). Plaintiff could not remember the date on which he was seen by Nurse Cassie (*Id.* at p. 79), but he thought that it was the first time he received care for his hand (*Id.* at p. 82). Neither party provided a copy of the medical record from this appointment (*see* Doc. 62; Doc. 64).

This testimony appears to be consistent with other documents in the record. Plaintiff's Medication Administration Record shows that a nurse with the initials "CB" did evening med pass on March 21, 22, 24, and 25 (Doc. 62-3, p. 4). In another document that was previously submitted to the Court, the Health Care Unit Administrator indicated that Plaintiff was seen on March 21st at nurse sick call and "puncture wound [treatment] protocol was initiated" (Doc. 30-1, p. 17). (The time of the appointment is not stated nor is the name of the nurse). The note from that visit apparently said "1cm open

area with greenish slough at wound bed, 2in x 1in redness/swelling to surrounding tissue" and indicated that the "wound happened with 'key' in 'cell'" (*Id.*). It made no mention of a staff assault or staff causing the injury in this note (*Id.*).

Plaintiff testified that Nurse Cassie treated his hand on more than one occasion, although he could not provide the dates on which those treatments occurred (Doc. 62-2, p. 98). In fact, he said he was supposed to be getting his hand cleaned and dressed every day (*Id.* at p. 95). Neither party provided any medical records regarding these subsequent treatments with Nurse Cassie or any other medical provider, to the extent that they occurred (Doc. 62; Doc. 64).

Nurse Cooper submitted a record showing that a social worker conducting rounds talked with Plaintiff on March 23, 2017 at 8:20am (Doc. 62-1, p. 4). The note from that encounter does not say anything about any open wound on Plaintiff's hand, nor does it indicate that he needed medical care (*Id.*). It says only that the social worker "discussed coping" with Plaintiff (*Id.*).

Plaintiff testified that he put in for nurse sick call for his back and was called to the Health Care Unit about a week after the incident with Sgt. Marvin (Doc. 62-2, pp. 81, 82, 89). He saw Nurse Dorsey, and while he was there, he showed her his hand and told her how the injury happened (*Id.* at p. 81). Plaintiff said Nurse Dorsey filled out an incident report, called Internal Affairs, and contacted the Physician's Assistant ("PA") (*Id.*). Plaintiff testified that the PA told him his hand was infected and the infection was spreading up his arm (*Id.*). Plaintiff said they cleaned the wound and gave him a shot of antibiotics (*Id.*).

Once again, Plaintiff's story appears to be consistent with another document previously submitted to the Court. The Health Care Unit Administrator indicated in an email that Plaintiff was seen by a nurse practitioner, who ordered an immediate injection of the antibiotic Rocephin, a ten-day course of the antibiotic Bactrim, "Motrin, and a dressing to wound" (Doc. 30-1, p. 17). A subsequent email from Internal Affairs Officer Pickford suggests this appointment occurred eight days after the alleged incident with Sgt. Marvin (*Id.* at p. 15; *see also* Doc. 1, pp. 5, 6). Neither party provided a copy of the medical record from this appointment (*see* Doc. 62; Doc. 64).

## ANALYSIS

Summary judgment is proper "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party always bears the initial responsibility of showing that it is entitled to summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013). The manner in which this showing can be made depends upon which party will bear the burden of proof on the challenged claim(s) at trial. *Celotex*, 477 U.S. at 331 (Brennan, J., dissenting). In cases such as this one, where the burden of proof at trial rests on the plaintiff, the defendant can make its initial showing on summary judgment in one of two ways. *Id.*; *see Hummel v. St. Joseph Cty. Bd. of Comm'rs*, 817 F.3d 1010, 1016 (7th Cir. 2016); *Modrowski*, 712 F.3d at 1168. First, the defendant can show that there is an absence of evidence—meaning a complete failure of proof—supporting an essential element of the plaintiff's claim. *Celotex*, 477 U.S. at 331; *Hummel*, 817 F.3d at 1016. Second, the defendant can present affirmative evidence

that negates an essential element of the plaintiff's claim. *Celotex,* 477 U.S. at 331; *Hummel*, 817 F.3d at 1016.

If the movant fails to carry its initial responsibility, the motion should be denied. *Kreg Therapeutics, Inc. v. VitalGo, Inc.*, 919 F.3d 405, 415 (7th Cir. 2019). On the other hand, if the movant does carry its initial responsibility, the burden shifts to the non-moving party to "inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered." *Wrolstad v. Cuna Mut. Ins. Soc'y*, 911 F.3d 450, 455 (7th Cir. 2018) (citation omitted). The non-moving party cannot rely on allegations in the pleadings but rather must come forward with evidentiary materials that set forth "specific facts showing that there is a genuine issue for trial" on all essential elements of his case. *Celotex*, 477 U.S. at 324; *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010); *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 702 (7th Cir. 2009); *see also* FED. R. CIV. P. 56(c)(1). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Armato v. Grounds*, 766 F.3d 713, 719 (7th Cir. 2014) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)). In deciding a motion for summary judgment, the court "must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party." *Hansen v. Fincantieri Marine Grp., LLC,* 763 F.3d 832, 836 (7th Cir. 2014).

### A. Failure to Intervene Claim

In Count 1, Plaintiff claims that Sgt. Marvin used excessive force when he slammed Plaintiff's hand into the chuckhole and stabbed it repeatedly with the chuckhole key, and

Nurse Cooper stood idly by and failed to stop Sgt. Marvin (Doc. 8).

To succeed on his failure to intervene claim, Plaintiff must show that Nurse Cooper witnessed Sgt. Marvin using excessive force against him and that she had a realistic opportunity to stop it but failed to do so. *Gill v. City of Milwaukee*, 850 F.3d 335, 342 (7th Cir. 2017) (citation omitted); *Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005) (citation omitted) ("'[P]olice officers who have a realistic opportunity to step forward and prevent a fellow officer from violating a plaintiff's right through the use of excessive force but fail to do so' may be held liable." (quoting *Miller v. Smith,* 220 F.3d 491, 495 (7th Cir. 2000))).[2]

"Whether an officer had sufficient time to intervene or was capable of preventing the harm caused by the other officer is generally an issue for the trier of fact unless, considering all the evidence, a reasonable jury *could not possibly conclude otherwise.*" *Abdullahi v. City of Madison*, 423 F.3d 763, 774 (7th Cir. 2005) (quoting *Lanigan v. Village of E. Hazel Crest, Ill.*, 110 F.3d 467, 478 (7th Cir. 1997)) (emphasis in original). In deciding whether a realistic opportunity to intervene existed, courts may consider, among other factors, the length of the excessive force, the number of blows involved, and the positions of the bystander relative to the altercation. *Howard v. Ealing*, 876 F. Supp. 2d 1056, 1072 (N.D. Ind. 2012) (citing *Kirkwood v. DeLong,* 683 F.Supp.2d 823, 830 (N.D. Ind. 2010)).

---

[2] The Court is unaware of any authority touching on whether prison healthcare staff have a duty to intervene if they observe one or more corrections officers using excessive force on a prisoner. *Henderson v. Ill. Dep't of Corr.*, No. 19-CV-00432-NJR, 2019 WL 3208183, at *3 (S.D. Ill. July 16, 2019) (discussing this issue). Nurse Cooper did not, however, contest that she can be held liable on this theory, (*see* Doc. 62), and so the Court will assume she can.

Thus, where the "excessive force consists of only one or two blows in quick succession" or where the incident "took only seconds," an officer may not have had a realistic opportunity to intervene. *Howard*, 876 F. Supp. 2d at 1072–73.[3] On the other hand, if there are multiple, separate blows, the bystander was standing close by, and the altercation lasted more than a few seconds, a jury could reasonably find that the bystander had reason to know that excessive force was being used and could have stopped it. *Id.*[4]

Here, Plaintiff testified that after he asked Sgt. Marvin for a grievance form, Marvin "instantly" slammed the chuckhole door and started stabbing him with a key. Neither Sgt. Marvin nor Plaintiff ever said a word during the incident. Plaintiff further testified that his hand was caught in the chuckhole for a matter of only "seconds." Given this evidence, no reasonable jury could possibly conclude that Nurse Cooper had enough time to intervene or was capable of preventing the harm. First, there is no evidence that Nurse Cooper had any reason whatsoever to anticipate that Sgt. Marvin was going to slam the chuckhole door on Plaintiff's hand and stab his hand with a key. "[T]his was a

---

[3] *See Timas v. Klaser*, 23 F. App'x 574, 579 (7th Cir. 2001) (affirming summary judgment where Officer Daza had no realistic opportunity to stop two other officers from using excessive force to arrest the Plaintiff when Daza "was in a different area of the apartment engaged in a different task."); *Gant v. City of Fort Wayne*, No. 1:16-CV-380-TLS, 2018 WL 689799, at *5 (N.D. Ind. Feb. 2, 2018) (finding officers had no realistic chance to intervene and stop third officer from shooting robbery suspect when "just over two second passed" from the time the first suspect opened the door of the store to run out, the second suspect followed, and the officer fired on the second suspect); *Xie v. City of Chi.*, No. 14-CV-6082, 2016 WL 6193981, at *4 (N.D. Ill. Oct. 24, 2016) (finding that it would be "patently unreasonable" to find that the defendants had a realistic opportunity to intervene when they had "only a few seconds to appreciate what was happening, let alone prevent the other officers from" acting).

[4] *See Kirkwood*, 683 F.Supp.2d at 830 (denying summary judgment on failure to intervene claim when the plaintiff presented evidence of three separate blows—a tackle, an arm bar, and a knee to the back—the officers were standing ten feet away or less, and the altercation may have lasted for twenty seconds).

sudden and unexpected quick incident with no signs of what was going to happen until it actually occurred." *Flores v. City of E. Chi.*, No. 2:15-CV-22, 2017 WL 25414, at *5 (N.D. Ind. Jan. 3, 2017). Second, even if Nurse Cooper was in close proximity to the cell door, like Plaintiff claims, there is no evidence that she was even paying attention to the exchange between Plaintiff and Sgt. Marvin. And third, in considering the time it took for Sgt. Marvin to slam the chuckhole door and jab Plaintiff with his key, this Court is convinced that no reasonable jury could conclude that Nurse Cooper had enough time to see what was happening, to evaluate why it was happening[5], and to assess whether it was necessary to step in and tell a *ranking officer* how to do the job that was entrusted to correctional officers, not medical staff. It simply happened too quickly and without warning.

For these reasons, Nurse Cooper is entitled to summary judgment on Count 1.

## B. Deliberate Indifference Claim

In Count 3, Plaintiff claims that Nurse Cooper was deliberately indifferent to his injuries after the March 20, 2017 incident when she refused to get him medical attention for three days following the events at issue, in violation of the Eighth Amendment (Doc. 8).

To succeed on a claim of deliberate indifference, the plaintiff must demonstrate that he suffered from an "objectively serious medical condition" and that the defendant

---

[5] This assessment of why this exchange was occurring is important because Nurse Cooper would need to make a determination whether Sgt. Marvin was using force in a good faith effort to preserve order and ensure security or whether he was using it in bad faith and for no legitimate purpose. *See McCottrell v. White*, 933 F.3d 651, 663 (7th Cir. 2019)

acted with a "sufficiently culpable state of mind," namely deliberate indifference. *Goodloe v. Sood*, 947 F.3d 1026, 1030–31 (7th Cir. 2020) (citing *Farmer v. Brennan*, 511 U.S. 825, 834, 837 (1994)).

In arguing that she is entitled to summary judgment on Plaintiff's claim of deliberate indifference, Nurse Cooper tries to catch Plaintiff in "gotcha" moment. She claims the medical records show Plaintiff did not actually have an open wound on his hand in the three days after the incident, like he says (Doc. 62, pp. 13–14). She also claims the medical records show she did not do med pass in the three days after the incident, which, according to the allegations in the complaint, is when she was indifferent to Plaintiff's wound (*Id.* at p. 15; *see* Doc. 1). However, neither of Nurse Cooper's arguments are sufficient to warrant summary judgment.

When it comes to the wound on Plaintiff's hand, Nurse Cooper points out that Plaintiff saw a nurse practitioner on March 21st and a social worker on March 23rd, neither of whom noted the presence of any wound on his hand or any complaints from Plaintiff about a wound on his hand (*see* Doc. 62-3, pp. 1, 3). But as previously indicated, it is apparent there are other medical records that were not submitted by Nurse Cooper that show Plaintiff *did* have a wound on his hand on March 21st. Thus, Nurse Cooper's attempt to negate this aspect of Plaintiff's claim is ineffective and she is not entitled to summary judgment based on this argument.

As for the dates on which she did med pass, Plaintiff's Medication Administration Records show that Nurse Cooper did not do med pass on March 21st, 22nd, or 23rd (Doc. 62-1, p. 3; Doc. 62-3, p. 4). But Nurse Cooper did not eliminate the possibility she was in

Room Restriction on those days for some other reason besides med pass. She could have stated in her affidavit, for example, that the only reason she ever went to Room Restriction was to do med pass or that she was off work on March 21st, 22nd, and 23rd. But she said nothing of the sort (*see* Doc. 62-1). She simply said she did not do med pass on those days. That is simply not enough to completely negate Plaintiff's version of the story. Furthermore, the Medication Administration Records show that Nurse Cooper *did* do evening med pass on March 26th and 27th (Doc. 62-3, p. 4). Thus, a reasonable jury could easily conclude that Plaintiff simply got the dates wrong as to when he requested medical treatment from Nurse Cooper for his hand.

Nurse Cooper made no other arguments as to why she might be entitled to summary judgment on Plaintiff's claim for deliberate indifference (*see* Doc. 62). Consequently, her motion for summary judgment as to Count 3 is denied.

## Conclusion

The motion for summary judgment filed by Defendant Hope Cooper (Doc. 61) is **GRANTED IN PART and DENIED IN PART.** It is **GRANTED** as to Count 1 for failure to intervene, which is **DISMISSED with prejudice** as to Defendant Cooper. Judgment will be entered in her favor as to Count 1 at the conclusion of this case. The motion for summary judgment is **DENIED** as to Count 3 for deliberate indifference.

This matter will proceed to trial on Counts 1 and 2 against Sgt. Marcus Marvin and Count 3 against Nurse Hope Cooper. The Court will set a status conference by separate order in order to discuss the utility of a settlement conference prior to appointing Plaintiff counsel and setting this matter for trial.

**IT IS SO ORDERED.**

**DATED: September 10, 2021**

                                                  **s/ Mark A. Beatty**
                                                  **MARK A. BEATTY**
                                                  **United States Magistrate Judge**